UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------x

JAY RUBINO,                                      CIVIL ACTION NO.:

        Plaintiff,                              1:12-_____

v.

MEDTRONIC, INC.,

        Defendant.

-------------------------------------------------------x

## COMPLAINT

### THE NATURE OF THE ACTION

1. This is a civil action for damages and remedies for disability discrimination in employment against Medtronic, Inc. ("Medtronic") by Mr. Jay Rubino in violation of: (a) Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.* as amended ("the ADAAA"), and (b) the Massachusetts Fair Employment Practices Law, G.L. c. 151B, §4.16 *et seq.*

### THE PARTIES

2. Mr. Rubino is a 47-year old man. He is a citizen of Connecticut with a last and usual residence in New Haven.

3. Medtronic is a Minnesota corporation, with its principal place of business in Minneapolis. Medtronic is in the business of developing and marketing medical devices, among other things.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1367.

5. Venue is proper in this district because the parties have entered into an agreement under the terms of which all issues between them are to be tried in Massachusetts.[1]

## ADMINISTRATIVE PRE-CONDITIONS

6. Mr. Rubino filed a timely Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") on August 8, 2011.[2] He received a Right-to-Sue letter (dated November

---

[1] A document styled *Confidentiality, Non-Competition and Non-solicitation Agreement* ("Agreement") was entered into between Mr. Rubino and CryoCath, Inc., his original employer, at the time of his original employment. Section 6.1 of Article 6 of the Agreement provides as follows:

**"CHOICE OF LAW; DISPUTE RESOLUTION; WAIVER OF JURY TRIAL FOR ALL DISPUTES**

6.1   The validity, interpretation and performance of this Agreement, and any and all other matters relating to the Employee's employment and any termination of employment from the Company including, without limitation, any offer letter provided to you in connection with your employment with the Company (all referred to as 'Employment Action'), shall be governed by and construed in accordance with the internal law of Massachusetts, without giving effect to conflict of law principles.

In the event of any dispute relating to an Employment Action, either you or the Company may request that the other participate in a mediation administered by the American Arbitration Association in accordance with its Employment Dispute Resolution Rules ('AAA EDR Rules'), such mediation to occur in Boston, Massachusetts. The party upon whom such request is made shall either agree or decline to participate in such mediation within ten (10) days of such request. In the event that mediation occurs, the Company shall pay the full cost of the mediation, excluding attorneys' fees. In the event that that [sic] any dispute relating to an Employment Action is not resolved through mediation (or direct negotiations), then any action, demand, claim or counterclaim (jointly "Action") commenced by either party relating to (i) any Employment Action, and/or (ii) the terms and provisions of this Agreement or to its breach, shall be commenced in Massachusetts in a court of competent jurisdiction. Both parties further acknowledge that venue shall exclusively lie in Massachusetts and that material witnesses and documents would be located in Massachusetts. Both parties further agree that any such dispute shall be tried by a Judge alone, and both parties hereby waive and forever renounce the right to a trial before a civil jury."

[2] The filing with the MCAD was timely because the parties entered into an agreement to toll the statute of limitations for filing with that agency, in a form recognized by that agency, on February 3, 2011.

15, 2011) from the EEOC on November 17, 2011, and files this Complaint within ninety days of receipt. A copy of the Notice of Right-to-Sue is attached as Exhibit A.

## SUMMARY

7. Mr. Rubino is a 47-year old man. He suffers from Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD"), although he was not diagnosed with those conditions until 2010.

8. Mr. Rubino was employed by Medtronic (after being employed by its predecessor, CryoCath, Inc. ("CryoCath") for over seven (7) years, working primarily from his home in Connecticut, servicing sales accounts primarily in Connecticut, New York, New Jersey and Pennsylvania after being hired by CryoCath in 2003.

9. Medtronic acquired Cryo-Cath in 2008.

10. During the weekend between August 5 and August 7, 2010, Mr. Rubino told his Manager at Medtronic, Joseph Kasztejna, that he had been diagnosed with ADD and ADHD.

11. On August 12, 2010, Mr. Kasztejna informed Mr. Rubino that Medtronic was terminating his employment.

## FACTS

12. In 2003, Mr. Rubino was employed by CryoCath, in Massachusetts, as a salesperson. Before going to work for CryoCath, Mr. Rubino and the company executed a written contract, some of the terms of which affect the nature and venue of this action. Mr. Rubino remained employed by CryoCath in 2008, when CryoCath was acquired by Medtronic.

He was responsible for selling products that related to the diagnosis and treatment of arrhythmias of the heart such as atrial fibrillation.

13. Mr. Rubino was always among his employer's top five producers—usually first, second or third—for every year except his last full year, 2009. Mr. Rubino's performance is reflected in his Performance Evaluations. Even in 2009, he successfully exceeded his assigned sales goal—an objective he had achieved previously, and which put him among a minority of salespeople. Prior to his termination, in August, 2010, Mr. Rubino had met all his business objectives and goals, including the transition requirements for newly hired sales representatives.

14. Before June, 2010, Mr. Rubino's Manager at Medtronic was Mark Feudtner. In January, 2010, the man who was ultimately to become his Manager, Joseph Kasztejna, was hired by Medtronic. With Feudtner's approval, Mr. Rubino traveled to Boston to be formally introduced to Kasztejna. At that point, it had not yet been decided when Kasztejna would succeed Feudtner as Mr. Rubino's Manager.

15. Beginning in April, 2010, at Feudtner's request, Mr. Rubino briefed Kasztejna on his business activities and objectives within his 4-state sales territory in order to familiarize him with his activities. Thereafter, Feudtner and Kasztejna accompanied Mr. Rubino to numerous meetings with his physician clients (*i.e.,* electrophysiologists and cardiologists), to specific cases (*i.e.,* surgeries) in which he participated, and meetings with the executives with whom he dealt with respect to his hospital management accounts. These meetings and surgeries all had positive outcomes.

16. After Medtronic acquired CryoCath, in addition to his regular coverage tasks within his sales territory, Mr. Rubino was assigned to train and educate new sales

representatives. He was asked by Medtronic to familiarize the new representatives with all his sales contacts, doctors, cryoablation cases, cryoablation in-services, cryoablation education, and to detail the contracts with existing accounts as well as his business activities with each account.

17. Between April-July, 2010, four new sales representatives were hired. They were assigned to take over accounts in Eastern Pennsylvania, New Jersey and Connecticut. At no time during his training and education of the new sales representatives were any negative comments or criticisms made to Mr. Rubino about his ability or performance. Rather, his Manager, Feudtner, and his future Manager, Kasztenja, told him numerous times that he was doing a good job on all these tasks.

18. As part of his work, Mr. Rubino was required to take regular examinations testing his skills. Before Kasztejna assumed the job of managing him, Mr. Rubino's performance on these examinations had not been the subject of criticism.

19. In May 2010—before Kasztejna took over as Mr. Rubino's Manager, but while he was closely involved in Mr. Rubino's activities on a regular basis—Mr. Rubino took a Value Based Selling ("VBS") examination and the electrophysiology/radio frequency ("EP/RF") ablation proficiency tests on line. He did not pass these examinations or a re-take of the EP/RF examination.

20. In June 2010, a meeting was held between Mr. Rubino, his then Manager, Feudtner, and his soon to be new Manager, Kasztejna, at which Feudtner transferred Mr. Rubino's management to Kasztejna. In the course of that meeting, Mr. Rubino received a detailed, positive review of his performance to date in 2010 from both men. Kasztejna told Mr. Rubino that he "look[ed] forward to [Mr. Rubino] continuing to be a leader of the North Atlantic

-5-

team." Mr. Rubino and Kasztejna discussed Mr. Rubino's performance rating and Kasztenja rated Mr. Rubino as a "successful contributor."

21. On June 19, 2010, Mr. Rubino was given a merit pay increase.

22. In July 2010, Mr. Rubino re-took the VBS examination. He did not pass it, although he was not so notified at the time.

23. During the weekend of August 5 to August 7, 2010, while attending a National Sales Meeting in Texas to which he had been invited by his employer, Mr. Rubino spoke with Kasztejna and was told, for the first time, that he had not passed the VBS examination re-take. They discussed what the issues were and how they would proceed on a going-forward basis.

24. During their meeting, Mr. Rubino told Kasztejna that he had been diagnosed with Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD"), that he was actively treating with a healthcare professional and taking prescription medication for these conditions.

25. Kasztejna and Mr. Rubino discussed what action plan needed to be pursued to ensure that Mr. Rubino passed future examinations. Mr. Rubino told him that, as a result of being on the medications prescribed for the ADD and ADHD, he felt that his ability to focus was improved. Kasztejna said he understood, and that "we all go through things that can affect our performance."

26. Kasztejna suggested (and Mr. Rubino agreed) that Mr. Rubino meet with an in-house Medtronic Clinical Educator to focus on the material for the next series of tests, which were scheduled for the following week. They further agreed that if there were any ongoing issues, Mr. Rubino would make sure that Kasztejna was aware of them.

27. That evening and through the weekend leading up to the examination, Mr. Rubino consulted with the Medtronic Clinical Educator and reviewed the material for the upcoming test.

28. Three days later, on the afternoon of August 11, 2010, Mr. Rubino was called by Ms. Krista Sandstrom of the Medtronic Human Resources department. She asked him how things were going and told him that Medtronic was there to support him in any way it could.

29. At approximately 5:00 p.m. on that day (August 11, 2010), Kasztejna emailed Mr. Rubino and asked him to meet with him the next morning (August 12, 2010).

30. Mr. Rubino took the examination on line on the evening of August 11, 2010. He scored a 96 %. (The passing grade was 80%.)

31. On the morning of August 12, 2010, Mr. Rubino met with Kasztejna and was told he was being terminated.

32. The explanation given by Kasztejna was that he had a "lack of confidence" in Mr. Rubino. Kasztejna said that the company was "moving way too fast for [Mr. Rubino] to re-take exams." He said that it did not matter that Mr. Rubino had scored a 96 % on the examination the previous evening. He said that he did not believe that Mr. Rubino "would be able to comprehend future material."

33. When Mr. Rubino offered to re-take the two examinations he had not passed, Kasztejna said that, even if Mr. Rubino passed them, he (Kasztejna) still had no confidence in Mr. Rubino.

34. Kasztejna then falsely said that Mr. Rubino's sales were not where they "should have been" for 2010.

35. Upon information and belief, other Medtronic employees, who were not disabled or handicapped, also failed these examinations but were not terminated. Some of them failed the examinations more than one time. All were told, in words and substance, that the Company would provide them with help and do whatever it could do to get all the employees "on the same page."

## COUNT I

(Disability Discrimination In Violation of Title I of the ADAAA, 42 U.S.C. § 12101, *et seq.*)

Mr. Rubino repeats and realleges all of the allegations contained in the foregoing paragraphs 1-35, as if specifically set forth herein.

36. The Defendant is an "employer" under Title I, 42 U.S.C. §12101(5).

37. At all relevant times, Mr. Rubino was an "employee" of Defendant under Title I, 42 U.S.C. §12101(4).

38. By its actions detailed above, Defendant unlawfully discriminated against Mr. Rubino on the basis of his disability, or because it regarded him as disabled in violation of 42 U.S.C. §12112.

39. Upon information and belief, Defendant's management was aware of the aforementioned discriminatory employment practices taken against Plaintiff, as more particularly described above, knowingly participated in such discriminatory practices and actions, and failed to take remedial action to correct these abuses.

40. As a result of Defendant's discriminatory practices, as more particularly described above, Mr. Rubino suffered and continues to suffer substantial damages, including lost wages and benefits.

41. As a result of Defendant's unlawful conduct, it is also liable for compensatory and punitive damages, interest, attorneys' fees, and costs.

### COUNT II
(Handicap Discrimination In Violation of the
Massachusetts Fair Employment Practices Law, G.L. c. 151B, §4(16))

Mr. Rubino repeats and realleges all the allegations of the foregoing Paragraphs 1 through 41 as if specifically set forth herein.

42. The Defendant is an "employer" under G.L. c. 151B, §1.5.

43. At all relevant times, Mr. Rubino was an "employee" of Defendant under G.L. c. 151B, §1.6.

44. At all relevant times, Mr. Rubino was a handicapped person as set forth in G.L. c. 151B, §1.17.

45. At all relevant times, Mr. Rubino was a "qualified handicapped person," as defined in G.L. c. 151B, §1.16.

46. By its actions detailed herein, Defendant unlawfully and willfully discriminated against Mr. Rubino on the basis of his handicapped status in violation of Massachusetts G.L. c. 151B, §4.16.

47. As a result of Defendant's discrimination, Mr. Rubino suffered and continues to suffer substantial damages, including lost wages and benefits and emotional distress.

48. As a result of Defendant's unlawful conduct, it is also liable for punitive damages, interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff prays the court to:

a. Award him damages on Count I of the Complaint, for violation of the Americans with Disabilities Act, as Amended, according to law;

b. Award him damages on Count II of the Complaint, for violation of G.L. c. 151B, according to law;

c. award him interest, according to law;

d. award him his costs and reasonable attorneys' fees, according to law;

e. grant such additional relief as the court deems reasonable and proper.

Dated:   January 10, 2012

**RESPECTFULLY SUBMITTED,**
**JAY RUBINO**

By his attorneys

*Jonathan J. Margolis*
Jonathan J. Margolis, Esq.
RODGERS, POWERS & SCHWARTZ LLP
BBO No. 319980
jmargolis@theemploymentlawyers.com
18 Tremont Street
Boston, MA 02108
Tel.: (617) 742-7010

OF COUNSEL: (Motions for admission *pro hac vice* are being filed contemporaneously with this Complaint)

Joseph D. Garrison, Esq.
Ethan Levin-Epstein, Esq.
GARRISON, LEVIN-EPSTEIN, CHIMES,
    RICHARDSON & FITZGERALD, P.C.
405 Orange Street

New Haven, CT  06511
Tel.: (203) 777-4425
Fax: (203) 776-3965
jgarrison@garrisonlaw.com
elevin-epstein@garrisonlaw.com